# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| JOSEPH D. PERKINS, | ) |
| PLAINTIFF, | ) |
| v. | ) CASE NO.: 2:11-CV-03679-MHH |
| LORETTA E. LYNCH., | ) |
| DEFENDANT. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Joseph D. Perkins initiated this employment action against defendant Loretta E. Lynch in her official capacity as the Attorney General of the United States for alleged retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). (Doc. 1).[1] This Court previously dismissed Counts I-V of Mr. Perkins's complaint. The only claim remaining in this action is Mr. Perkins's claim of retaliatory hostile work environment. (*See* Docs. 14, 15 & 16). The Attorney General seeks summary judgment on this remaining claim. (Doc. 56). In support of the motion, the Attorney General argues that Mr. Perkins cannot prove his retaliatory hostile work environment claim because all of the alleged retaliatory acts occurred after Mr. Perkins's protected

---

[1] Mr. Perkins named Attorney General Eric H. Holder, Jr. in his official capacity as the defendant in this action. (Doc. 1). This Court substitutes Attorney General Loretta E. Lynch as defendant for former Attorney General Eric H. Holder, Jr.

activity. (Doc. 47, pp. 12-13). The Attorney General also argues Mr. Perkins cannot establish his claim because the alleged retaliatory acts are not severe or pervasive enough to amount to a hostile work environment. (Doc. 57, pp. 13-15). For the reasons discussed below, the Attorney General has not carried his initial burden of persuasion. Therefore, the Court will deny his motion for summary judgment.

I.     **Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of persuading a court that there are no genuine issues of material fact for a factfinder (usually a jury) to decide. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, then the burden shifts to the nonmoving party to "go beyond the pleadings" to establish a genuine issue for trial. *Id.* at 324. If the moving party does not meet its initial burden, then the Court must deny the motion for summary judgment. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) ("If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the nonmovant has made.") (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party. *E.g., Hill v. Wal-Mart Stores, Inc.*, 510 Fed. Appx. 810, 813 (11th Cir. 2013). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II. Relevant Undisputed Facts and Procedural Background[2]

Mr. Perkins is a retired Special Agent ("SA") of the Federal Bureau of Investigation. (Doc. 58-1, p. 10; Doc. 57, p. 1). He was assigned to the Birmingham Division's Gadsden Resident Agency ("GRA") from 1996 until his retirement from the FBI. (Doc. 58-1, pp. 10-11; Doc. 57, p. 1).

In January 2007, SA Perkins and SA Danny Lee Garnett, who also was assigned to the GRA, met with Carmen Adams, the Special Agent in Charge ("SAC") of the Birmingham Division of the FBI, and Keith D. Bryars, the Assistant Special Agent in Charge ("ASAC") of the Birmingham Division. (Doc. 58-1, pp. 20, 56; Doc. 60-3, p. 2; Doc. 62-1, p. 3). At the meeting, SA Perkins and SA Garnett reported issues concerning Supervisory Special Agent ("SSA") John Bacot, the agent who was supervising the work of FBI agents in Gadsden. (Doc. 58-1, pp. 20, 56; Doc. 62-1, p. 3). ASAC Bryars described the meeting this way:

---

[2] To the extent any factual inferences are drawn, they are drawn in favor of Mr. Perkins, the non-movant.

3

> Danny Garnett and Dave Perkins, two Special Agents (SA) assigned to the FBI Gadsden Resident Agency (GRA), came to the Birmingham Division Headquarters in early 2007 and spoke with [SAC] Adams and myself. . . . They [] complained about the management practices of then SSA John Bacot, an African-American. They said Bacot provided preferential treatment to Ed Sims, another African-American SA also assigned to GRA, when SSA Bacot accompanied SA Sims on an interview of a source.

(Doc. 60-3, p. 2). During the meeting, SAC Adams told SA Perkins and SA Garnett they would never win a reverse discrimination lawsuit. (Doc. 59-1, p. 22).[3] Shortly after the meeting, SAC Adams and ASAC Bryars began accusing SA Perkins and other agents in the GRA of conducting unauthorized investigations and illegally accessing computers. (Doc. 59-1, p. 92; Doc. 62-1, p. 3).

On January 10, 2007, SAC Adams sent an e-mail to the Birmingham Division stating that SSA Bacot was returning to FBI Headquarters to take advantage of a career enhancing opportunity. (Doc. 58-1, pp. 22-23; Doc. 1, ¶ 23). As a result, the agents at the GRA were placed under the supervision of ASAC Bryars. (Doc. 58-1, p. 31). That same day, SA Perkins met with several other agents from the GRA to discuss SAC Adams's and ASAC Bryars's response to the complaints about SSA Bacot. (Doc. 58-1, pp. 35, 53, 54, 58). The agents placed a

---

[3] SA Perkins states in his complaint that he did not mention race in this conversation. (Doc. 1, ¶ 21). However, in his sworn statement, SA Perkins asserts that "SA Garnett and I made known to Birmingham management, specifically Special Agent in Charge Carmen Adams and Assistant Special Agent in Charge D. Keith Bryars, that SSA John Bacot, an African-American, was exercising preferential treatment towards SA Ed Sims, another African-American . . . ." (Doc. 62-1, p. 3). Because SA Perkins's complaint is not verified, the Court accepts Mr. Perkins's sworn statement for purposes of the defendant's motion and views that statement in the light most favorable to SA Perkins.

4

call to Equal Employment Opportunity (EEO) Counselor Lorenza Moore to express concerns. (Doc. 58-1, pp. 53, 60). Later that day, Mr. Moore met with the agents in person. (Doc. 58-1, p. 54). The agents informed Mr. Moore that they wanted to file an EEO complaint. (Doc. 58-1, p. 35). However, after the agreed-upon 30-day cooling off period, the agents did not file a complaint. (Doc. 58-1, p. 35).

Beginning on January 17, 2007, SAC Adams sent SA Kevin Kelley to provide local supervision for the agents at the GRA. (Doc. 62-1, pp. 3-4). Until SA Kelley arrived in Gadsden, the GRA had been operated out of the Birmingham Office and had never had direct supervision. (Doc. 58-1, pp. 31-32). Beginning in September 2007, Supervisory Senior Resident Agent ("SSRA") Robert F. Lasky became the direct supervisor of the GRA. (Doc. 62-1, p. 5). SSRA Lasky commented openly that senior management in Birmingham did not like SA Perkins. (*Id.*, p. 5). On several occasions in January 2008, SSRA Lasky told SA Perkins and at least two other agents at the GRA that they had "targets" on them from management. (Doc. 58-1, p. 37; Doc. 60-2, p. 1; Doc. 62-1, p. 5). Shortly after SSRA Lasky made the comments about the agents having targets on them, he told SA Perkins and SA Garnett they "could retire any time . . . before anything could be done to [them]." (Doc. 58-1, pp. 42-43).

SA Perkins did not receive a quality step increase award in 2008, and SSRA Lasky did not nominate him for the award.[4]  (Doc. 60-2, pp. 1-3; Doc. 62-1, p. 7). However, SA Perkins admits that (1) a FBI employee must receive an "outstanding" rating on his or her Performance Appraisal Report (PAR) for the prior fiscal year to be recommended to a quality step increase, and (2) he did not receive an "outstanding" rating on his 2007 PAR.  (Doc. 61-1, p. 1).[5]

Beginning in April 2008, SSRA Lasky began changing SA Perkins's work assignments frequently.  (Doc. 58-1, p. 43; Doc. 62-1, pp. 7-8).  SA Perkins contends that he and SA Garnett were the only agents in the GRA whose responsibilities were in constant flux (Doc. 62-1, p. 8); the other five agents in the office were able to maintain their assignments.  (Doc. 58-1, p. 44).  Additionally, there were instances in which SA Perkins was not allowed to work on cases to which he was assigned.  (Doc. 58-1, p. 46; Doc. 62-1, pp. 8-9).

In 2008, FBI Headquarters directed the Birmingham office to send a special agent to the FBI Academy in Quantico, Virginia for a temporary duty ("TDY") assignment to serve as a class counselor for new agents.  (Doc. 60-1, p. 2).  The

---

[4] According to FBI policy, quality step increase awards "are intended to recognize 'exemplary employees whose sustained, high-quality performance is at a level that substantially exceeds an acceptable level of competence' and such awards are limited to only six percent of eligible [] employees on an annual basis."  (Doc. 8-3, p. 3) (citation omitted).

[5] SA Perkins has not challenged his 2007 PAR in this action, but during his January 2007 meeting with FBI management, "SA Perkins advised [SAC Adams and ASAC Bryars] he was being 'represented' by SA Garnett in his PAR grievance."  (Doc. 60-3, p.2).

Acting Special Agent in Charge, Charles Regan, was responsible for selecting an agent for the FBI Academy assignment. (*Id.*, p. 2). The Birmingham office of the FBI selects agents to fill TDY assignments from a particular squad based on a rotation list so that the responsibility for filling TDY assignments does not always fall to one squad. (*Id.*, p. 3). Based on the rotation list, SAC Regan had to choose an agent from the GRA for the TDY Assignment to Quantico. (*Id.*).

In a signed sworn statement, SAC Regan asserts that the agents in the GRA were canvassed about the assignment, but no one volunteered. (*Id.*). SAC Regan considered the qualifications and responsibilities of the agents in Gadsden and determined that SA Perkins was the most logical choice for the assignment. (*Id.*, p. 4). SAC Regan also wrote the names of the GRA agents on a piece of paper, cut the paper into strips, and placed the strips into a hat. (*Id.*, p. 5). At SAC Regan's direction, Acting ASAC Greg Bowden pulled a strip of paper from the hat; he selected SA Perkins's name. (*Id.*, p. 5). SAC Regan states that "[e]ven if SA Perkins['s] name had not been selected I would have had to re-evaluate the decision to send someone else other than SA Perkins." (*Id.*, p. 5).

The evidence regarding the TDY assignment is disputed. SAC Regan states that "[b]oth Acting ASAC Bowen and SSRA Lasky agreed that SA Perkins was the most logical choice." (Doc. 60-1, p. 4). However, in SSRA Lasky's sworn statement, he says, "I did not think Perkins was the best selection as he is very

7

quiet and was assigned to an important public corruption investigation." (Doc. 60-2, pp. 5-6).

In October 2008, SA Perkins contacted EEO Coordinator Moore and filed an EEO complaint against the FBI. In his complaint, SA Perkins contends that the FBI discriminated against him in reprisal for his complaint about SSA Bacot. (Doc. 8-1, pp. 1-2; Doc. 58-1, pp. 21, 52). On January 28, 2009, SA Perkins received written notification that five issues regarding his EEO complaint were accepted for investigation. (Doc. 8-2, pp. 1-2). On July 27, 2011, the Equal Employment Opportunity Commission issued its decision finding SA Perkins "was not retaliated against and/or subjected to retaliatory harassment . . . ." (Doc. 8-3, p. 15). On October 19, 2011, SA Perkins filed this federal court action against then-Attorney General Eric H. Holder, Jr. (Doc. 1). SA Perkins asserts various claims under Title VII and § 1983. (*Id.*).

The Attorney General filed a motion to dismiss, and this Court dismissed all of SA Perkins's claims other than his retaliatory hostile work environment claim. (Docs. 7, 14, 15 & 16). The Attorney General now seeks summary judgment on this remaining claim. (Doc. 56).

### III. Analysis

Title VII of the Civil Rights Act prohibits employers, including government employers, from discriminating in the workplace on the basis of a person's "race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Title VII also prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, [] assisted, or participated in any manner in an investigation . . . under [Title VII]." 42 U.S.C. § 2000e-3(a). "To establish a prima facie case of retaliation under Title VII, '[SA Perkins] must show (1) that []he engaged in statutorily protected expression; (2) that []he suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).

With respect to the second element of a prima facie case of retaliation, SA Perkins contends that the hostile environment in which he worked constitutes an adverse employment action. The Eleventh Circuit "recognizes a cause of action for retaliatory hostile work environment." *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012). To rise to the level of an adverse employment action, the retaliatory harassment SA Perkins suffered must be "sufficiently severe or pervasive to alter the terms and conditions of employment." *Id.*

The Attorney General argues SA Perkins cannot establish his retaliatory hostile work environment claim because his protected activity took place after the alleged retaliatory acts. Alternatively, the Attorney General argues the alleged retaliatory activity was not severe or pervasive enough to alter the terms and

9

conditions of SA Perkins's employment. The Court addresses each of those arguments in turn.

    A.    <u>SA Perkins's Protected Activity</u>

"A prima facie case of retaliatory hostile work environment, like a prima facie case of retaliation generally, requires the establishment of protected activity." *Wheatfall v. Bd. of Regents of Univ. Sys. of Ga.*, 9 F. Supp. 3d 1342, 1359 (N.D. Ga. 2014) (citing *Gowski*, 682 F.3d at 1311). Statutorily protected activity includes "voicing complaints of discrimination to [an employee's] supervisors . . . ." *Id.* However, "to engage in protected activity, the employee must [], at the very least, communicate [his] belief that discrimination is occurring to the employer . . . ." *Demers v. Adams Homes of Northwest Florida, Inc.*, 321 Fed. Appx. 847, 852 (11th Cir. 2009) (citation and internal quotation marks omitted). The employee "cannot rely on the employer to infer that discrimination has occurred." *Id.*

It is only logical that a plaintiff's protected activity must take place before the alleged retaliatory actions; otherwise, the plaintiff cannot demonstrate a causal link between the protected activity and the alleged retaliation. *See Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) ("The plaintiff must at least establish that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff.") (citations

omitted). The Attorney General argues SA Perkins's claim fails as a matter of law because there was only one protected expression—the October 2008 EEO complaint—and that communication occurred after the alleged retaliatory conduct. (*See* Doc. 57, pp. 2, 5, 12-13; Doc. 62, pp. 1, 5-6, 8). The Court is not persuaded.

The Attorney General bases her argument concerning the timing of the protected expression on the magistrate judge's Report and Recommendation regarding the Attorney General's motion to dismiss. (Doc. 62, p. 6). Indeed, in his Report and Recommendation, the magistrate judge stated that SA Perkins's January 2007 meetings with FBI management and the EEO counselor were not protected activities. (Doc. 14, pp. 37-38). However, when he wrote his Report and Recommendation on the motion to dismiss, the magistrate judge did not have the benefit of the Rule 56 record; the magistrate judge relied solely on the allegations in the complaint. At this stage in the litigation, the Court must consider evidence in the Rule 56 record to evaluate the Attorney General's motion for summary judgment, and the Court is not limited to the allegations in the complaint.

The evidence in the summary judgment record, viewed in the light most favorable to SA Perkins, indicates that SA Perkins engaged in protected activity well before October 2008. During the January 2007 meeting with FBI SAC Adams and ASAC Bryars, SA Perkins complained about SSA Bacot's alleged preferential treatment of African-Americans. (Doc. 62-1, p. 3). In a sworn

11

statement, ASAC Bryars asserted that during the January 2007 meeting, SA Perkins and SA Garnett complained that "SSA Bacot, [an African American,] provided preferential treatment to Ed Sims, another African-American SA also assigned to GRA . . . ." (Doc. 60-3, p. 2).[6]  These communications constitute protected activity.  *See Shannon*, 292 F.3d at 715 n. 2.  Because Title VII protects informal complaints like these, and these complaints preceded the defendant's alleged retaliatory activity, the Attorney General is not entitled to summary judgment on the grounds that the protected activity occurred after the alleged retaliatory acts.

     B.    <u>Severe or Pervasive Harassment</u>

When determining if retaliatory harassment alters the terms and conditions of employment, courts employ the analysis used in other hostile work environment actions.  *Gowski*, 682 F.3d at 1312 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993), and *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002)); *Swindle v. Jefferson County Comm'n*, 593 Fed. Appx. 919, 928-29 (11th Cir. 2014) (citations omitted).  Accordingly, to determine if the retaliatory harassment constitutes an adverse employment action, courts consider:  "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and

---

[6] In his deposition, SA Perkins testified that during the 2007 meeting, SAC Adams stated that SA Perkins "would never win a reverse discrimination lawsuit . . . ." (Doc. 59-1, p. 22).

12

(4) whether the conduct unreasonably interferes with the employee's job performance."  *Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citations omitted).  The Attorney General argues SA Perkins's claim fails because the alleged retaliatory acts were not severe or pervasive enough to alter the terms of his employment, and therefore, he cannot show he suffered a hostile work environment.  (*See* Doc. 57, pp. 13-15).  Again, the Court is not persuaded.

The Attorney General's argument is premised on her contention that SA Perkins's September 2008 TDY assignment to Quantico is the only retaliatory act the Court may consider because it is the only act that occurred during the forty-five days preceding SA Perkins's October 2, 2008 contact with an EEO counselor. (Doc. 57, pp. 12-13; Doc. 62, p. 8).[7]  For purposes of a hostile work environment analysis, however, a court is not limited to considering only those actions that occurred within a 45-day period preceding a plaintiff's first contact with an EEO counselor.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

A retaliatory hostile work environment claim is not based on a single discrete act of retaliation, but instead "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  *See Id.* (quoting 42

---

[7] In a portion of his brief copied directly from the magistrate judge's Report and Recommendation, SA Perkins also contends that his TDY transfer to Quantico is the only alleged retaliation which should be considered. (*See* Doc. 61, pp. 5-6; *see also* Doc. 14, p. 34).  However, the Court does not need to address or consider SA Perkins's arguments in opposition to summary judgment unless the Attorney General first carries her burden of proof.  *See Celotex Corp.*, 477 U.S. at 323; *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

U.S.C. § 2000e-5(e)(1)); *Gowski*, 682 F.3d at 1312-13.  If one of the actions that allegedly contributed to a hostile work environment was timely reported, then "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117.  Here, the record establishes that at least one of the actions contributing to SA Perkins's alleged hostile work environment—his 2008 TDY assignment to Quantico—was timely reported to an EEO counselor.  (*See* Doc. 8-1, pp. 1, 3).  Therefore, the Court may consider the other retaliatory conduct that SA Perkins describes.

The Attorney General asserts that even if the Court considers all of the alleged retaliatory actions, those actions still are not severe or pervasive enough to alter the terms of SA Perkins's employment.  (Doc. 57, p. 14).  Specifically, the Attorney General argues SA Perkins "was not subject to any disciplinary actions, was not demoted, did not lose pay, did not receive a poor performance review, was not reassigned to a different position or location, and did not endure any objectively threatening behavior."  (Doc. 57, p. 14).  The actions that the Attorney General enumerates are not an exhaustive list of the types of actions that can create a hostile work environment.  Indeed, the Eleventh Circuit has held that a hostile work environment may exist when none of the actions listed by the Attorney

14

General occurred. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 803-06, 813-14 (11th Cir. 2010).

Additionally, the Attorney General did not address any of the factors courts consider in determining if the alleged harassment was severe or pervasive enough to alter the terms and conditions of a plaintiff's employment. *Mendoza*, 195 F.3d at 1246 (listing the factors courts consider to determine if harassment is severe or pervasive enough to alter the terms and conditions of a plaintiff's employment). Although the Attorney General argues the reasons provided by FBI management for the alleged retaliatory activity establishes that the alleged harassment was not severe or pervasive enough to alter the terms of SA Perkins's employment, the reasons offered for the activity do not go to the severe or pervasive element of the retaliatory hostile work environment claim. As a result, the Attorney General did not meet her burden of showing an absence of a genuine issue of material fact with respect to the severity or pervasiveness of alleged retaliatory acts. The Attorney General is not entitled to summary judgment based on the grounds argued in her brief.

Because the Attorney General did not meet her initial burden to establish the absence of a genuine issue of material fact that would entitle her to judgment as a matter of law, the Court need not and does not discuss SA Perkins's opposition

brief, which is largely copied from the magistrate judge's Report and Recommendation. (*Compare* Doc. 14, *with* Doc. 61).

## IV. Conclusion

For the reasons discussed above, the Court **DENIES** the Attorney General's motion for summary judgment.

**DONE** and **ORDERED** this March 4, 2016.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE